UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Jennifer Posteraro

    v.                                                    Civil No. 13-cv-416-JL
                                              Opinion No. 2015 DNH 237P

RBS Citizens, N.A. and
Christos Hatzidakis

### MODIFIED MEMORANDUM ORDER ON SUMMARY JUDGMENT

*Certain findings contained in this order were modified in the court's order on the plaintiff's motion for reconsideration (Order, January 25, 2016, document no. 82). The court's ruling on the motion for summary judgment remained unchanged.*

From September 2010 until August 2011, plaintiff Jennifer Posteraro worked for defendant RBS Citizens, N.A. ("Citizens Bank" or "Citizens") at two bank branches in Manchester, New Hampshire. Defendant Christos Hatzidakis was Posteraro's supervisor at her first branch posting. Posteraro claims that virtually her entire tenure at Citizens was rife with gender and disability-based harassment that Citizens failed to address and that Citizens also refused to make reasonable accommodations for her disabilities, specifically, post-traumatic stress disorder ("PTSD"), depression and anxiety. Ultimately, Posteraro filed an eight-count complaint in state court, alleging violations of state and federal statutory and common law. Her claims can be broken down as follows:

      --disability discrimination by Citizens' failure to provide
      reasonable accommodations, in violation of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112-12117 and its state law counterpart, N.H. Rev. Stat. Ann. § 354-A:7 (Counts 1 and 2);

--sexual harassment severe and pervasive enough to create a hostile working environment, in violation of Title VII, 42 U.S.C. § 2000e et seq., and its state law analog, N.H. Rev. Stat. Ann. § 354-A:7 (counts 3 and 4);

--retaliation and constructive discharge for opposing sexual harassment and pursuing accommodation for her disabilities, in violation of Title VII and N.H. Rev. Stat. Ann. § 354-A:19 (Counts 5 and 6); and

--intentional infliction of emotional distress and wrongful discharge under state common law (Counts 7 and 8).

Defendants timely removed the case to this court, invoking federal question and supplemental jurisdiction. 28 U.S.C. §§ 1331(a), 1367 and 1441(a). Before the court is defendants' motion for summary judgment, in which they argue that the undisputed material facts demonstrate that they are entitled to judgment as a matter of law on all eight counts. After review of the motions, memoranda, exhibits, reply and surreply briefs, the court grants the motion, except as to the retaliation claim in counts 5 and 6.

## I.  Applicable Legal Standard

Summary judgment is dictated when the "movant shows that there is no genuine dispute as to any material fact and the movant party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it could

reasonably be resolved in either party's favor at trial by a rational fact-finder. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010). A fact is "material" if it could sway the outcome under applicable law. Id. In analyzing the motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" party. Id. "A properly supported motion for summary judgment cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective or rank speculation." DeLia v. Verizon Commc'ns Inc. 656 F.3d 1, 3-4 (1st Cir. 2011) (quoting Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010)). With this backdrop in place, the court turns to Posteraro's claims.

**II.   Factual background**

A.   Sexual harassment-related comments

        Posteraro began working at Citizens in early September 2010 at a bank branch in a supermarket on South Willow Street in Manchester. Defendant Hatzidakis, her supervisor, was the branch manager. Professionally, Posteraro did well in the early stages of her tenure. She reached over 160 percent of her sales goal in the fourth quarter of 2010, in return for which Citizens awarded her with a certificate of achievement for being among the top ten performers in her region. She earned the same accolade for the first quarter of 2011. Hatzidakis similarly recognized

3

Posteraro's accomplishments, commending her demeanor and observing in her evaluation that she "epitomize[s] the type of value added interactions Citizens Bank is looking for . . . [and] also goes above and beyond with customers to guarantee that they will have a pleasant experience and she never over-promises and consistently over-delivers."

At the same time, however, Posteraro was growing concerned with the behavior of some of her co-workers.  Her concerns originally arose during her training period when she was first working in the South Willow Street branch.  Posteraro observed "inappropriate" behavior on the part of assistant branch manager Jeff Evans and teller manager Sean Lawrence with which she "was uncomfortable." (Pltff. Dep. at 75).   Specifically, Posteraro said the pair was talking about television shows in the teller line and she "just felt like they weren't behaving the way I thought that people in a bank would be behaving.  It was just very – it was kind of goofy behavior and I was a little concerned."  (Id. at 76).  The only specific comments that Posteraro recalled that were sexual in nature involved use of the sexually suggestive retort "that's what she said."[1]  Otherwise,

---

[1] This banter was a staple of the television situation comedy "The Office."  That's what she said, tvtropes.org, http://tvtropes.org/pmwiki/pmwiki.php/Main/ThatsWhatSheSaid (Last visited Dec. 17, 2015).

Posteraro said, "it was just a general feeling of it wasn't the professional atmosphere I thought it was going to be."  (Id. at 77).  Posteraro reported her observations to her Citizens trainer, and while she couldn't recall the specifics of what she reported, she didn't think she particularly complained during her training to either the trainer or anyone else at Citizens about sexually inappropriate behavior.  (Id. at 79).

Posteraro witnessed other ribald discussions during the first few months of her employment at the South Willow Street branch.  For example, on one occasion in October 2010, Posteraro was within earshot of Evans and a customer "literally talking about pornography."  (Id. at 81).  When her facial expression registered disapproval one of the two men said, "Oh, come on. It's not like you don't watch."  (Id.).  Posteraro left the area with her cash drawer and retreated to the back of the office. Posteraro also claims that Evans spoke frequently about a television show called "Skins," which Posteraro understood to be a show "all about teens having sex."  (Id. at 95-96). Additionally, Evans told a story about "a man who had sex with a piece of lawn furniture."  (Id. at 96).

On December 15, 2010, Posteraro emailed Citizens Regional Manager Nancy Towne requesting a transfer to a "traditional" branch, i.e., a stand-alone unit, as opposed to her then-current

location within a supermarket.  The next day, Towne reminded her
of Citizens' policy that new hires were expected to remain in
their hiring location for a minimum of one year.  Later that day,
Posteraro called Citizens' Employee Relations office and reported
that she was "uncomfortable with her co-workers because they tell
a lot of off-color and sexual jokes."  When asked to provide
specific examples, Posteraro said that one of her co-workers
brought up Playboy Magazine with a customer, who then commented
to her, "Oh, come on, you know you like porn, too."  It was these
type of comments, Posteraro said, that led to her asking for the
transfer the previous day.  Citizens requested more detailed
information and also opened an official investigation because of
a possible violation of its harassment policy.

Employee relations representative Dayna Walters followed up
with Posteraro on January 7, 2011.[2]  During a roughly one-hour
telephone conversation, Posteraro reported, <u>inter alia</u>, that:

> --her co-workers frequently would use the "that's what
> she said" remark to turn stray comments into sexual
> innuendo;
> --Hatzidakis told her, in response to her complaints of
> discomfort over the sexual banter, that he gave the
> other employees permission to keep making such comments
> as long as she wasn't in the room;

---

[2] The record reflects that the gap between the mid-December
and early January contacts was due in large part to Posteraro's
absence from work around Christmas.  A few days' absence was
medically-related, while much of the time was scheduled vacation.

--she was subjected to a reference to tea bags which
she interpreted as sexual innuendo;
--Evans responded to her requests to refrain from joke-
telling by telling Posteraro to "lighten up";
--Hatzidakis acted unprofessionally (unrelated to
sexual conduct) on several occasions; and
--she believed another female Citizens employee had been
discriminated against due to her pregnancy.

Also on January 7, Towne added an additional sales manager,
Linda Tremblay to the South Willow Street Branch to "add
stability and to keep an eye on things."

Responding to Walters's request for more details, Posteraro
indicated in a January 9 email that Towne had called her after
the conversation with Walters "and was very responsive" to her
concerns.  Her email also related a couple of other off-color
comments she witnessed.  On January 11, Walters spoke with
Hatzidakis to address Posteraro's complaints.  Walters did not
identify Posteraro by name, warned Hatzidakis that the complaints
could be coming from multiple sources and reminded him of
Citizens' anti-harassment and anti-retaliation policies.  She
also noted issues with his credibility, observing that many of
Hatzidakis's answers regarding the behavior of he and his
subordinates were internally inconsistent.

The next morning, Posteraro informed Walters that Hatzidakis
had instructed her to let him know about inappropriate comments
so that he could address the situation immediately.  Posteraro
said she reminded Hatzidakis that she had complained previously

7

and that nothing had changed.  Regardless of that exchange
however, Posteraro reported on January 20 that the branch
environment had been great since the conversation with Hatzidakis
(and with the presence of Tremblay).  She said that "everyone was
leaving [her] alone" and "the guys have been fine."  Posteraro
also told Walters that she was no longer interested in
transferring.  Internally, Citizens closed Posteraro's case,
while noting that Hatzidakis's administrative deficiencies were a
problem.  Although Posteraro believed that Lawrence (and possibly
Evans) thereafter made "that's what she said" comments, she did
not report any such conduct to Hatzidakis or Citizens' employee
relations department.

C.   Disability discrimination allegations

Posteraro alleges that she was diagnosed with PTSD in 2006,
in the aftermath of an abusive relationship.  Although she did
not make this information known to Citizens during the hiring
process, Posteraro informed her fellow branch employees in
September 2011 and asked them to refrain from throwing things
near her, slamming doors, and coming up behind her.  She made
that request in response to the fact that Lawrence, Evans, and
Hatzidakis did things that would startle her.  In February 2011,
Lawrence told her that he would "do certain things" to watch her
jump because he thought it was funny.

In late February 2011, Posteraro emailed Hatzidakis with information about PTSD.  The next day, the two met and Posteraro explained her PTSD and that two recent "acts of physical aggression" by Hatzidakis had caused her a great deal of stress.  Specifically, she was referring to a February 6 incident in which Hatzidakis yelled at her in his office with the lights off and door closed while hovering over her, causing her fear.[3]  She asked and was allowed to turn on the lights.  The second incident happened on February 9 when Posteraro heard a "loud thud" from an adjacent room.  Although she did not see it occur, Hatzidakis told her that he had kicked a chair across the room.

Posteraro emailed Linda Tremblay the next day (February 23) and described the meeting with Hatzidakis the previous day as "having no yelling . . . but there was a lot of placing blame on me."  As relevant here, there was nothing in the email to Tremblay that expressed any feelings that she was being treated in a certain way because of her PTSD.  She emailed Towne on March 8, detailing her work situation.  The email is rife with examples of interpersonal conflict between Posteraro and Hatzidakis.  More specifically, Posteraro observed that:

---

[3]As relevant here, the parties describe the office as having a window that faces the interior of the supermarket.  There is no indication that the February 6 encounter occurred in total darkness.

Christos has changed, dramatically.  Since January he
has developed a very short fuse with me and only me.  I
am yelled at almost daily.  I have been brought to
tears numerous times and at points have feared for my
safety.  Christos will go into the back and throw
things, kick chairs and he expects it not to effect me.
The day of the audit I started stuttering after the
phone call you had with him and the auditors; he went
into the back room with a very angry look on his face
then there were loud crashing noises. He later admitted
to kicking a chair across the room.

She also detailed some of Hatzidakis's comments to her, and

concluded by telling Towne:

I have tried having calm, rational conversations with
Christos over the past two months and it usually ends with
no resolution.  Last week I called Christos and we, spoke
for over an hour and I asked him "where they [sic] guy who
hired me went because I really liked him and wanted to work
for him?"  He responded that he was ordered to be mean to us
because we weren't meeting our goals.  I offered up the
suggestion that "degrading and humiliating the one person
who is doing their job may not be an effective tactic
because all it does is model bad behavior to the guys.  You
are telling them that if you do your job you get yelled at.
If you are nice to Jen and treat her with respect then you
are not on our team."

He said he hadn't looked at it that way.  I reminded
Christos that I withdrew my application to Willow because I
couldn't leave our branch in the lurch.  I felt like I could
really help the branch and I wanted us all to succeed.  He
acknowledged that I am the only person who cares about the
branch and takes ownership of their work and because of that
he agreed to go back to the person who he used to be and I
agreed to give him another chance.

It lasted until Sunday night at closing.  In the midst
of everything I called you and left a message.

Christos is destroying my confidence and I am getting
physically ill because of these things.  I want to be
able to go to work, do my job and maybe enjoy the
company of my colleagues.  At this time that is not

possible. He blamed me for "getting me trouble with HR
and Nancy" last week when we spoke and I think that
sums it up, at least from where I am sitting.

I do not want to leave my branch, I want it to function
normally.  I don't know if that can be done given the
dynamic in the branch but I am willing to do what you
suggest to repair and rebuild relationships.

Posteraro returned to work on Thursday, March 10.  On
Friday, March 11, Posteraro reported that she felt ill "due to
the situation at the branch."  She left work, and reported to her
physician that she was having anxiety and stress issues as a
result of the office situation and her belief that she was being
retaliated against for complaining about sexual harassment.  She
also filed for Worker's Compensation, claiming "mental anguish
from supervisor yelling at her," and giving an injury date of
February 6.

At Posteraro's request, Citizens granted her a medical leave
of absence effective March 11.  She did not thereafter return to
the South Willow Street branch.  On April 14, 2011, Posteraro,
through counsel, requested an accommodation for PTSD, depression,
anxiety and panic attacks.  Specifically, she requested to be
moved to the McGregor Street branch.  The request was based on a
note from her doctor indicating that Posteraro could return to
work with the accommodation of relocating "to a different branch
or office other than her current location."  Citizens responded
with an offer to relocate her to its Milford branch – the only

11

one with an immediate opening – to which Posteraro objected due
to the commuting distance.  Citizens' acquiesced to Posteraro's
original request, and on May 3, 2011, Posteraro began working in
a Banker I position (her former role) at Citizens' McGregor
Street branch.  She worked at McGregor Street until May 20, 2011,
before going out on medical leave once again.

Posteraro faced several contentious situations during her
short tenure at McGregor Street.  First, the branch manager was
not happy because she was "thrust upon them."  She reported this
to her attorney, but not Citizens' human resources department.
Subsequently, the branch manager became "annoyed" when Posteraro
said she'd be unable to attend a scheduled session to make
business calls due to a therapy appointment.  The manager
apparently had not been told of the appointment.  Posteraro does
not claim that she was prevented from going to the appointment.

Posteraro also believed that the assistant manager was
making fun of her therapy sessions when she referred to a former
employee's therapy as a "joke."  In addition, Posteraro felt that
she was "put in a position to fail" because supervisors were not
present to provide needed approval to certain transactions she
originated, and because of an incident where a customer yelled at
her and the branch manager refused to help her.  Posteraro
conceded in deposition that she had no information that anyone at

McGregor Street knew of her PTSD.  Ultimately, she left the
branch on the afternoon of May 20, 2011.  The day before, she had
requested that her therapist write her a note to get her out of
work because she felt as though she was being unjustly
criticized.  Citizen again granted Posteraro's request for ADA
leave from May 20 through August 4, and then extended to August
19, 2011.

In early August, Posteraro's attorney informed Citizen's
that she was awaiting a doctor's recommendation as to a return-
to-work accommodation.  Citizens assured the attorney that her
prior Banker position was available for Posteraro upon her
return, at branches other than the ones at which she had worked.
On August 15, the attorney informed Citizen's that jobs in a bank
branch were not acceptable and asked what non-branch jobs were
available or could be created for Posteraro.  Citizens indicated
that there were no "back of the house" (i.e., non-retail)
positions available, but only either full or part time branch
positions in her former role.  On August 19, Posteraro's attorney
informed Citizens that Posteraro would not be returning to work.
Citizens then terminated her employment.

13

## III. **Legal Analysis**[4]

A.  Sexual Harassment

Posteraro claims that Citizens violated both state and federal law by subjecting her to sexual harassment due to a hostile work environment.  The court addresses both claims under the federal (Title VII) standard.  See Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 92 (D.N.H. 2011).  To prevail on her hostile environment claim, Posteraro must prove:

> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Ponte v. Steelcase, Inc., 741 F.3d 310, 320 (1st Cir. 2014).  There is an additional legal wrinkle with respect to the last factor, employer liability.  As previously noted, Posteraro has alleged acts both by co-workers and Hatzidakis, her supervisor.  Those allegations are treated differently.  In the case of allegations against her co-workers, Posteraro "must demonstrate

---

[4] In order to keep the analysis somewhat chronologically consistent with the narrative, the court addresses the sexual harassment claims (Counts 3 and 4) first.

that the employer knew or should have known about the harassment
yet failed to take prompt and appropriate remedial action."
Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 36 (1st
Cir. 2012) (quoting Wilson v. Moulison N. Corp., 639 F.3d 1, 7
(1st Cir. 2011)).  As to Hatzidakis, Citizens is liable if he
created a hostile work environment if the harassment "results in
a tangible employment action against the employee." Agusty-Reyes
v. Dept. of Educ. Of P.R., 601 F.3d 45, 53 (1st Cir. 2010).
Citizens is also liable for Hatzidakis's severe or pervasive
harassment that does not result in tangible employment action
unless it can show that it "exercised reasonable care to prevent
and correct promptly any sexually harassing behavior," and that
Posteraro "unreasonably failed to take advantage of any
preventative or corrective opportunities provided by the employer
or to avoid harm otherwise." Perez-Cordero v. Wal-Mart P.R.,
Inc., 656 F.3d 19, 30 (1st Cir. 2011) (quoting Burlington
Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998)).

     Here, Posteraro's sexual harassment claim falters at several
steps along the analytical way.  While Posteraro is undoubtedly a
member of a protected class and that the alleged harassment was
unwelcome, Posteraro's own characterization of her initial
observations at South Willow Street during training as not being
"the professional atmosphere I thought it was going to be" lacks

15

indicia that her observations during training were "based on sex."  This factor is also undercut by her failure to report any sexually inappropriate conduct to her trainer specifically or to Citizens generally.

As far as the remaining allegations go, even taking them in the light most favorable to Posteraro, the totality of the comments Posteraro complains of were not "sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment."  Ponte, 741 F.3d at 320. In analyzing the "severe or pervasive" factor, the court considers "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance."  Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir. 2013).  Here, the workplace comments were sporadic and weren't always directed at Posteraro.  Moreover, the comments as reported by Posteraro did not involve physical threats to her.  This stands in contrast to, for example "the disgusting comments, conversations and treatment of [plaintiff that] were continuing consistent and occurred everyday."  White v. N.H. Dep't. Of Corr., 221 F.3d 254 260 (1st Cir. 2000).  It is certainly true that isolated incidents "if egregious enough" can evince a hostile work environment.  Ponte, 741 F.3d at 320 (citing Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir.

16

2005)); see e.g., Billings v. Town of Grafton, 515 F.3d 39, 47–50 (1st Cir. 2008) (reversing a grant of summary judgment in favor of employer on a hostile work environment claim where supervisor repeatedly and egregiously stared at a female employee's breasts on many occasions over a multi-year period).  But here, even if the court assumes that Posteraro's work performance was interfered with, the co-worker comments she complains of were neither frequent nor pervasive, nor was any particular comment egregious enough to support a hostile environment sexual harassment claim.

Even beyond the lack of severity or pervasiveness, Posteraro's sexual harassment claim also founders on the final factor – finding a basis for Citizens' liability.  With respect to the behavior of her co-workers, Posteraro cannot reasonably argue that Citizens did not take prompt and appropriate remedial action upon receiving her complaint.  As previously noted, there is no evidence that she complained of sexually inappropriate conduct related during her training period.  The undisputed fact is that her first complaint to Citizens was her December 15, 2010 phone call, the day after her transfer request.  Following her absence from the office, it was not until January 7, 2011, that she detailed her complaints to Citizens.  The record reflects that Citizens remained in contact with both Posteraro and

Hatzidakis and that by January 20, 2011, roughly two weeks after
the details of her complaints were made known to Citizens,
Posteraro reported that Citizens efforts had been so successful
that she was withdrawing her transfer request.

Posteraro's claim based on Hatzidakis' harassment is even
weaker.  The only claim of sexually inappropriate behavior by
Hatzidakis is his use, on one or two occasions, of an arguably
vulgar euphemism in his communication with another branch.  While
the court does not consider this incident sufficient to trigger
Citizens' liability, Posteraro has also failed to identify any
tangible employment action.  Her only allegation in this regard
is that her January 2011 job evaluation contained "middling
ratings" on her performance review.  The record does not support
this allegation.  The evaluation is brimming with compliments
from Hatzidakis in each of five categories.  Indeed, in five
paragraphs of narrative description, there is not a single
negative comment.  Her only complaint is that the numerical grade
assigned to her overall summary was a "3," rather than the "4"
(on a scale of 5) she thought she deserved.  Given the effusive
praise that dominates the evaluation, this single data point does
not constitute "a tangible employment action" against Posteraro.
Cf. Agusty-Reyes, 601 F.3d at 54 (reversing summary judgment in
employer's favor where plaintiff's supervisor resisted evaluating

18

plaintiff for months and then gave her a dismal review when she refused to "touch him").

Against this legal and factual backdrop, Posteraro's sexual harassment claims (Counts 3 and 4) must fail.

B.   Disability harassment

Posteraro asserts claims under both state and federal disability discrimination laws, which prohibit "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); see also N.H. Rev. Stat. Ann. § 354:A-7, I (barring employers "because of the . . . physical or mental disability. . . of any individual," to "discriminate against such individual . . . in terms, conditions or privileges of employment."   The federal law standard applies to both claims. Parker v. Accellent, Inc., 2014 DNH 237, 13.   The parties assume, sub silentio, that the operative statutes also proscribe disability-based harassment.   The court will do the same.   See Quiles-Quiles v. Henderson, 439 F.3d 1, 4 n.1 (1st Cir. 2006) ("Although we have not had occasion to evaluate disability harassment as a viable theory of recovery, we have assumed that it is viable.").

To prevail on her harassment claim, Posteraro must prove that (1) she has a disability, (2) she was subjected to a hostile

environment, and (3) the hostility was directed at her because of her disability. Quiles-Quiles, 439 F.3d at 5.  Although Citizens argues otherwise, the court finds the evidence sufficient for purposes of this motion that Posteraro did suffer from PTSD during the relevant time frame.[5]  Beyond that finding, however, the court finds that Posteraro's disability harassment claim falters on the second and third factors.

To support a hostile environment argument, Posteraro must point to evidence from which a rational jury could find that her "'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.'"  Quiles-Quiles, 439 F.3d at 7 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Here, Posteraro has pointed to scant evidence of this sort of pervasive harassment, and even less evidence that it was related to her disability.  It is undisputed that the earliest that Hatzidakis knew of Posteraro's PTSD was her February 22, 2011, email preceding their meeting.  As previously noted, early in her South Willow Street tenure she told branch employees about

---

[5]Although the record contains no formal PTSD diagnosis until after the events at issue, Posteraro testified that a social worker diagnosed her in 2006.  At this stage of the proceedings her testimony is sufficient.

her PTSD and asked them not to throw things near her, slam doors, or come up behind her and startle her.  Posteraro testified in her deposition that Sean Lawrence admitted in February 2011 to waving his hands in front of her to "watch her jump."  But beyond that, she has described no specific actions by Hatzidakis or her coworkers which can be reasonably related to her PTSD symptoms. The earlier confrontations with Hatzidakis took place well before she made him aware of her PTSD, and thus cannot have been directed at her because of her disability.  Indeed, there is nothing in the summary judgment record that suggests that Posteraro ever complained to Citizens' human resources personnel about disability-related harassment -- by Hatzidakis or anyone else -- as opposed to the lengthy trail of communications regarding her concerns with the sexual comments in the office.

Regarding her roughly two-week stint at the McGregor Street branch following her leave of absence, Posteraro claims that the incidents described above -- being told that she was "thrust upon them," expressing surprise at her therapy appointment (but not preventing her from attending), and making a therapy-related joke about a former employee -- constituted continuing disability-related harassment.  The court disagrees.  Not only were these incidents not pervasive enough to qualify as "harassment," there is no evidence that the McGregor Street branch employees knew of

her disability, and thus their actions could not have been "because" of that disability.[6]

   This evidence, even in the light most favorable to Posteraro falls far short of the "constant mockery" or "constant ridicule" sufficient to prove a claim of disability based harassment.  See e.g., Quiles-Quiles, 439 F.3d at 7; Arrieta-Colon v. Wal-Mart, 434 F.3d 75, 88 (1st Cir. 2006).  Moreover, while the record is replete with considerable evidence of Hatzidakis's professional shortcomings, anti-discrimination laws "do not establish a general civility code for the workplace." Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).[7] Instead, the plaintiff must demonstrate that the putative harassment was related to a protected characteristic. Ultimately, Posteraro has failed to demonstrate a genuine issue of material fact as to whether the alleged harassment was "severe or pervasive," or was directed at her because of her PTSD.

------

   [6] The record of Posteraro's only therapy session during her time at McGregor Street also cuts against her harassment claim. She was very critical of the branch manager and reported that she had received a reprimand "for not pushing credit cards on elderly people."  The only mention of anything remotely related to harassment was her dissatisfaction that Hatzidakis had yet to be fired.

   [7] The overall picture painted of Hatzidakis's workplace performance and deportment is not a pretty one.  But it is not a picture of disability-based harassment.  And courts do not "sit as super personnel departments," assessing the wisdom of an employers' regular management practices.  Perez v Horizon Lines, Inc., 804 F.3d 1, 10 (1st Cir. 2015).

C.  Disability accommodation[8]

Employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); N.H. Rev. Stat. Ann. § 354-A:7, VII(a).  Here, Posteraro describes the requested accommodation in both general terms -- that she be provided with a "peaceful calm environment where I didn't feel threatened for my safety emotionally or physically" – and specifically that she be moved into a non-retail branch position that did not involve interaction with the public.  The court begins by noting that Posteraro's initial requests for accommodation were indisputably granted -- she was given leaves of absence without fail and she was moved, consistent with her doctor's recommendation (but not bank policy), from South Willow Street to McGregor Street after her first leave ended.  It is only the last phase of her relationship with Citizen that remains at issue.

Next, the court finds that the request for a "peaceful calm environment" is too vague to be considered a request under the

---

[8] The court notes that Posteraro's argument on this point spans only a few sentences and is thus not sufficiently developed to warrant consideration.  See Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) (noting that the court is free to disregard arguments that are not adequately developed).  Nevertheless, the court will address it in the interest of thoroughness.

ADA or state law.  See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012).  Moreover, it's not clear that any such request was ever communicated to Citizens.

As for her specific request, Posteraro, through her attorney, acknowledged that there were no non-branch jobs available.[9]  Citizens, however, made it clear that she could return to her former Banker position, which she declined. Citizens correctly observes that it is not required to eliminate essential functions of Posteraro's job, such as public interaction, as an accommodation.  Kvorjak v. State of Maine, 259 F.3d 48, 57 (1st Cir. 2001).  Nor was it required to accede to Posteraro's counsel's request that a new position be created for her.  Mulloy v. Acushnet Co., 460 F.3d 141, 153-54 (1st Cir. 2006).  The evidence can only support a conclusion that Citizens responded reasonably to Posteraro's accommodation requests. Accordingly, Posteraro's failure to accommodate claim fails as a matter of law and Citizens is entitled to summary judgment on Posteraro' disability-related claims (Counts 1 and 2).

---

[9] Although the record is not crystal clear, it appears that "non-branch" refers to a central office position as opposed to a position in the branch system.

D.  Retaliation

        To prove retaliation under state and federal law, Posteraro
must demonstrate that:  1) she engaged in protected conduct; 2)
she was subject to an adverse employment action; and 3) there was
a causal connection between the first two factors.  Soto-
Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 30 (1st
Cir. 2015).  Evaluation of her claim uses a modified version of
the familiar McDonnell-Douglas approach.  411 U.S. 792, 802
(1973).  If the plaintiff makes the above prima facie showing of
impermissible retaliation, the burden of production shifts to the
defendant, who must offer a legitimate, non-retaliatory reason
for the adverse employment action.  Soto-Feliciano, 779 F.3d at
30.  If the defendant does offer such a reason, the inquiry moves
to the final stage, at which the plaintiff bears the burden of
showing that the proffered reason is a pretext calculated to mask
retaliation.  Id. at 30-31.  To defeat summary judgment, however,
Posteraro need not prove retaliation by a preponderance of the
evidence.  She has only the lighter burden of showing that a
genuine issue of material fact exists about whether retaliation
was the true motive for the adverse employment action in
question.  Id. at 31.

        For present purposes, there is no dispute that Posteraro
engaged in protected activity by seeking relief for sexual

harassment and her disability.  She alleges two types of adverse employment action in her complaint.  First, that Citizens "refus[ed] to provide her with timely management approval of basic functions, refusing to communicate with [her], poisoning her ability to transfer [from] the [South] Willow Street branch and otherwise mentally torturing and intimidating [her] at virtually every interaction."  Second, Posteraro alleges that retaliation took the form of constructive discharge.

Addressing the latter contention first, the court finds that the undisputed circumstances here conclusively defeat any claim of constructive discharge.  Although Posteraro was officially terminated, Citizens took that action only after Posteraro rejected Citizens' offer of a Banker position at a third different branch.  Although Posteraro argues that working conditions were "intolerable," she must also demonstrate that Citizens "did not allow [her] the opportunity to make a free choice regarding [her] employment relationship."  Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 51 (1st Cir. 2008) (quoting Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004)).  Posteraro essentially alleges her free will was compromised because the working conditions at the new branch "would be so intolerable" as to make her decision reasonable, "rather than to endure continued mistreatment." (Complaint ¶ 112;

26

emphasis added).  But, "apprehension of future termination is insufficient to establish constructive discharge – instead, an employee is 'obliged not to assume the worst, and not jump to conclusions too fast.'"  Id. at 52 (quoting Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002)).  Finally, "[t]he standard for addressing a constructive discharge claim 'is an objective one: it cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held.'"  Id.  (quoting Marrero v. Goya of P.R., 304 F.3d 7, 28 (1st Cir. 2002)).

Here, the objective evidence is that Posteraro was granted leave immediately upon request, was transferred, at her request, to a branch away from her putative harassers, and offered her original job at yet a third branch with presumably different personnel.  Yet her final sought-after accommodation had nothing to do with bank personnel, but was aimed at avoiding customer contact.  Against this backdrop, Posteraro cannot claim that her decision to not return to work resulted from a constructive discharge.

With regard to her other claim of adverse employment action, however, the court finds the evidence sufficient for this claim to survive summary judgment.  Posteraro correctly observes that escalation of a supervisor's harassment after she lodged a complaint can constitute an adverse employment action sufficient

27

to support a retaliation claim.  See Perez-Cordero, 656 F.3d at
31.  The ultimate issue is whether the alleged retaliation would
"dissuade a reasonable worker from making or supporting a charge
of discrimination." Augusty-Reyes, 601 F.3d at 57 (citing
Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57
(2006)).  Viewing the evidence in the light most favorable to
Posteraro, the court rules that a reasonable jury could so find.

As previously noted, Posteraro first complained to Citizens'
employee relations department about sexual harassment in early
January 2011, and the issue was resolved to her satisfaction by
January 20.[10]  Posteraro's theory is that Hatzidakis escalated
his harassment -- non-sexual in nature, see supra, Part III.A --
because Citizens deemed his own work deficient, and Posteraro's
complaints were placing his job in jeopardy.  The record provides
support for this claim.  With regard to the February 6 incident,
Posteraro testified that Hatzidakis became angry after she asked
to make "cold calls" to customers (Pltff. Dep. 121).  Although
she could not recall what he said, she testified that the
confrontation lasted more than a few minutes and concluded with
Hatzidakis allowing her to make the phone calls she had
requested.  However, other branch employees were not working on

---

[10] While Posteraro complained directly to her co-workers
earlier in her tenure, she does not allege that their behavior
escalated in response, only that it continued.

28

the teller lines as they were supposed to be, forcing Posteraro
to essentially do their jobs.  When she expressed this to
Hatzidakis, he called her into his office and "vent[ed] his
frustration," although she could not recall what he said.  (Id.
at 129-30).  The rest of that day went smoothly.  (Id.).
Posteraro's other allegations of retaliatory actions include the
February 9 chair-kicking incident (which Posteraro did not
witness, but heard and viewed the aftermath), that he often
yelled at her, including, at one point, "for getting him in
trouble," and that he engaged in an undescribed type of "physical
aggression" on March 6, 2011.  Posteraro emailed Towne on March
8, and was out on leave a few days later.

    Coming as it did only a short time after Posteraro's sexual
harassment complaint, there is sufficient temporal proximity
between the complaint and Hatzidakis's later displays of temper
that could support a retaliation claim.  See Mariani-Colon v.
Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216 (1st Cir.
2007).  This is especially true when combined with Hatzidakis's
comment about Posteraro "getting him in trouble."  These facts
are sufficient to set forth a prima facie case of retaliation.

    Rather than address the burden-shifting analysis, defendants
instead argue that the retaliation claim fails because Posteraro
did not engage in further protected activity after the January

29

20th resolution of the sexual harassment complaint of which
Hatzidakis had notice.  Implicitly, according to Citizens,
Posteraro's sexual harassment claim ceased being a "protected
activity" once it was resolved, even with respect to behaviors
occurring shortly afterward.  Citizens cites no support for this
proposition and the court is unaware of any.  Perhaps if a period
of months or years had passed with no further incidents, a
plaintiff would be hard-pressed to rely on the earlier complaint.
But here, evidence supports Posteraro's claim that Hatzidakis
treated her adversely not long after her harassment complaint,
and his own words about her "getting him in trouble," arguably
tie his treatment to her complaint.  Accordingly, summary
judgment is denied on Counts 5 and 6 to the extent they involve
Hatzidakis's treatment of Posteraro following her sexual
harassment complaint in early January 2011.

E.   Intentional Infliction of Emotional Distress

     In order to succeed on this claim asserted under New
Hampshire law, Posteraro must prove that Hatzidakis or Citizens,
"by extreme and outrageous conduct, intentionally or recklessly
cause[d] severe emotional distress to another."  Morancy v.
Morancy, 134 N.H. 493, 496 (1991) (quotation omitted).  "In
determining whether conduct is extreme and outrageous, it is not
enough that a person has acted with an intent which is tortious

30

or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice." Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 729 (2009) (citation and quotations omitted). Rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id.

Here, even in the light most favorable to Posteraro, Hatzidakis's conduct falls far short of meeting the "extreme and outrageous" standard.  At best, he was ineffective in putting an end to sexual banter in the office and lost his temper on a few occasions.  Posteraro's claim that he "poisoned the well" at McGregor Street is not supported by the record and would probably not satisfy the "extreme and outrageous" standard even if it had record support.  Although the court has already ruled that a jury could find that Hatzidakis's behavior amounted to retaliatory conduct, that claim requires different proof than intentional infliction of emotional distress.  See Konefal v. Hollis/Brookline Co-op. Sch. Dist., 143 N.H. 256, 261 (1998) (noting that "outrageous conduct" contemplates "a great deal more" than simply "illegal and reprehensible conduct") (internal quotation marks omitted).  Here, while Posteraro expressed fear,

Hatzidakis's most egregious conduct was rare and sporadic.
Moreover, there is no allegation of any physical conduct directed
at her, and the chair-kicking incident did not occur in her
presence.  None of this is to say that Hatzidakis's alleged
conduct did not go beyond the merely unprofessional to the
deplorable, but New Hampshire law requires more.  Accordingly,
Hatzidakis is entitled to summary judgment on Count 7.

Posteraro's allegations against Citizens boil down to its
response to her harassment complaints.  But as this court has
noted, "[e]xcept in extraordinary circumstances, a party's
failure to respond to complaints does not rise to the level of
intentional infliction of emotional distress." Brodeur v.
Claremont Sch. Dist., 2009 DNH 082, 66 (quoting, Bowers v.
Concord Opthamologic Assocs., PA, 2003 DNH 219, 6-7 (citing
cases)).  Here, as previously noted, Citizens did respond to
Posteraro's complaints.  As the circumstances required to support
this claim are absent here, summary judgment on Count 7 is
granted to Citizens.

F.  Wrongful termination

Under New Hampshire law, a plaintiff claiming wrongful
termination must establish that (1) her termination was motivated
by bad faith, retaliation or malice; and (2) that she was
terminated for performing an act that public policy would

encourage or for refusing to do something that public policy would condemn.  Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 248 (2006).  Posteraro claims that her termination was a response to her complaints of sexual harassment and disability discrimination.  However, as the court previously found in addressing her constructive discharge argument, Posteraro declined to return to work on advice of counsel because Citizens would not provide her with the specific accommodation she requested.  Based on the same rationale, the court finds that the summary judgment record does not support a claim for bad faith, retaliation or malice concerning her final departure from Citizens.  Accordingly the court grants summary judgment as to Count 8.

## IV.   **Conclusion**

Based on the foregoing, defendants' motion for summary judgment[11] is GRANTED as to Counts 1-4, 7 and 8.  The motion is DENIED as to Counts 5 and 6.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

---

[11]Document no. 22.

Dated: February 9, 2016

cc:  John P. Sherman, Esq.
     K. Joshua Scott, Esq.
     Martha Van Oot, Esq.
     Debra Weiss Ford, Esq.